**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL FUDALI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | 10 C 6744 |
| | ) | |
| **JANET NAPOLITANO, Secretary,** | ) | **Hon. Judge John Z. Lee** |
| **Department of Homeland Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Fudali, who is employed by the Transportation Security Administration ("TSA"), has sued Janet Napolitano, Secretary of the Department of Homeland Security, for national origin and age discrimination, retaliation, and hostile work environment pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* Defendant Napolitano has moved for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons provided herein, the Court grants in part and denies in part Defendant's motion.

## Facts

Unless otherwise noted, the following facts are undisputed. Plaintiff is a Caucasian male of Polish national origin, who was born on September 25, 1952. Def.'s LR 56.1(a)(3) Stmt. ¶ 1; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 80; Pl.'s Ex. 1, Pl.'s Dep. at 12. TSA hired Plaintiff in March 2002. Pl.'s Ex. 1, Pl.'s Dep. at 7, 11.

Jobs within TSA are categorized into "bands," such as G-Band, H-Band, etc., with each sequential letter denoting a higher pay-grade than the previous letter. *Id.* ¶ 4. From November

2003 to March 2008, Plaintiff was employed by TSA as a screening supervisor of baggage at O'Hare Airport, but neither party apprises the Court as to the particular band category of that position. Def.'s LR 56.1(a)(3) Stmt. ¶ 3. In March 2008, TSA promoted Plaintiff to Supervisory Transportation Security Inspector, an H-Band position, at O'Hare Airport. *Id.* ¶ 31.

Plaintiff contends that TSA discriminated against him based on his age and national origin when he was denied promotions in 2007, 2009, 2010, and 2011 and was given an "Exceeds Standards," rather than a "Role Model," performance rating in November 2007. *Id.* ¶¶ 2, 23-24. He filed EEOC complaints against TSA on December 21, 2007, and September 14, 2010, and alleges that TSA retaliated against him for lodging those complaints when it denied his promotion applications in 2009, 2010, and 2011 and denied him a pay raise (an "In-Position Increase," or "IPI") in 2009. *Id.* Plaintiff also alleges that he was subjected to a hostile work environment in the form of offensive comments and jokes made by co-workers and supervisors because of his Polish national origin. *Id.* ¶¶ 22, 28-30, 41-43; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 1-6. He further argues that he was subjected to a hostile work environment because his supervisor, Eustacio Berganos, made several age-related comments. Def.'s LR 56.1(a)(3) Stmt. ¶ 44.

### *Denial of Promotion to Behavior Detection Officer ("0367 Position")*

In July 2007, Plaintiff applied and interviewed for a promotion to Behavior Detection Officer, a G-Band position, at O'Hare Airport with job listing VAN TSA-HQ-2007-0367 ("0367 Position"). *Id.* ¶ 5. Plaintiff asserts, and Defendant disputes, that immediately before Plaintiff's interview for this position, Screening Supervisor Michael Ray told Plaintiff an offensive joke that NAACP meant "niggers are actually colored Polacks" as he escorted Plaintiff to the interview and before he introduced Plaintiff to the two interviewers. *Id.* ¶ 10. The record does

not show that Ray had any further involvement in the interview or selection process for the 0367 Position.

John Thurwanger and Scott McKellips were the individuals who interviewed candidates, including Plaintiff, for the 0367 position. *Id.* Each interview was scored by ranking the applicant on a scale of 1 (low) to 5 (high) based on his or her responses to the same set of questions in the following nine categories: Attention to Detail; Decisiveness; Flexibility; Interpersonal Skills; Multi-Tasking; Self-Management; Teamwork; Team Building; Operations Management; and Oral Communications. *Id.* ¶ 7.

Thurwanger states that Plaintiff was unable to address many of the points needed when answering the interview questions. Pl.'s Ex. 14, Thurwanger Aff. at 001448. The interviewers asked each candidate to describe a situation that the candidate had experienced while working for TSA, and then awarded points if the candidate could relate who and what was involved, how and why it occurred, and what, if any, quality improvements resulted from the situation. *Id.* According to Thurwanger, Plaintiff was able to generally describe situations but was unable to add much detail. *Id.* Candidates who received higher scores than Plaintiff were able to provide more specifics. *Id.* Thurwanger stated that almost all of Plaintiff's answers related to situations that occurred many years ago. *Id.* Thurwanger and McKellips reached a consensus and gave Plaintiff an interview score of 13 out of a possible 40 points. Def.'s LR 56.1(a)(3) Stmt. ¶ 8. The lowest score among the applicants was 13, and the highest score was 40. Pl.'s Ex. 14, Thurwanger Aff. at 001447. A minimum score of 3 in each of the nine categories was required to receive a passing score, and thus, Plaintiff received a failing score on the interview. *Id.*

Kenneth Fletcher, Deputy Federal Security Director, had the authority to hire for the 0367 Position. Def.'s LR 56.1(a)(3) Stmt. ¶ 7. He did not select Plaintiff. *Id.* Fletcher did

select four other candidates for the 0367 position: (1) Josh Bubinas (twenty-eight years old, Caucasian, and with an interview score of 38/40); (2) Joseph Cazares (thirty-eight years old, Hispanic, and with an interview score of 36/40); (3) Kevin Freel (fifty-eight years old, Caucasian, and with an interview score of 40/40); and (4) Nigal Nazar (forty-four years old, Asian/Pacific Islander, and with an interview score of 38/40). *Id.* ¶ 9.

### *Denial of Promotion to Transportation Security Manager ("0425 Position")*

In August 2007, Plaintiff applied for the position of Transportation Security Manager, an H-Band position, with job listing VAN TSA-HQ-2007-0425 ("0425 Position"). Gail Georgalas, Reshawn Seabury, and Larry Gallatin interviewed the candidates, including Plaintiff, for the 0425 position. *Id.* ¶ 10. The interviewers for the 0425 position scored each candidate's interview with the same scoring system and categories used for the 0367 position. *Id.* ¶ 11. Plaintiff received a score of 29 out of a possible 50 points for the 0425 position. *Id.* ¶ 12. During the interview, the interviewers asked each candidate to assess a problem and describe a solution. Def.'s Ex. P, Georgalas Aff. at 104299. Georgalas states that many candidates only provided vague and unresponsive answers, but three of them, Randy Kolb, Michael Ray, and Allen Saunders, provided responses that stood out because they were more fully descriptive. *Id.*

Fletcher did not select Plaintiff for the 0425 position. Def.'s LR 56.1(a)(3) Stmt. ¶ 13. Rather, Fletcher selected two candidates: (1) Allen Saunders (forty-seven years old and African-American); and (2) Michael Ray (sixty years old and German-Irish). *Id.* ¶ 13. The record does not include Saunders and Ray's interview scores. *See id.* TSA's documents show that Michael Ray was initially listed as "NS" or not selected for the 425 position. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 13. Plaintiff, however, does not dispute that Ray was, in fact, selected for the position. *See id.*

***Denial of Promotion to Expert Transportation Security Officer ("0471 Position") &
Expert Behavior Detection Officer ("0445 Position")***

In August and September 2007, Plaintiff applied and interviewed for the positions of Expert Transportation Security Officer, with job listing VAN TSA-HQ-2007-0471 ("0471 Position"), and Behavior Detection Officer, with job listing VAN TSA-HQ-2007-0445 ("0445 Position"). Both were H-Band positions. Def.'s LR 56.1(a)(3) Stmt. ¶ 17. For the 0471 Position, Plaintiff was flown to Dallas-Fort Worth Airport for the interview. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 12. During that interview, Plaintiff was asked about his accent by the interview panel members, and Plaintiff informed them that he was Polish. *Id.* One of the panel members said, "Flying you out after you had failed at ORD is like a Polish joke. Why are you here? Why did they do this?" *Id.*

Michael Kimlick, Branch Chief, Behavior Detection Branch, Office of Security Operations at TSA headquarters, had authority to make the hires and did not select Plaintiff for either position. Def.'s LR 56.1(a)(3) Stmt. ¶ 19. Kimlick did not consider Plaintiff for either position because Plaintiff had previously received a failing score when interviewing for the 0367 Position at O'Hare Airport. *Id.* ¶¶ 18-19. Kimlick had no knowledge of Plaintiff's national origin at the time he decided that Plaintiff would not be considered for the 445 and 471 Positions. *Id.* ¶ 20. Kimlick selected the following fourteen candidates for the 0471 Position and 0445 Positions: (1) James Dixon (forty-nine years old and African-American); (2) Peter Ethier (thirty-nine years old and Caucasian); (3) Scott Holubec (thirty-one years old and Caucasian); (4) Marion Hudson (twenty-six years old and African-American); (5) Franklin Leatherbury (thirty-eight years old and African-American); (6) Tertia Lynch (thirty-four years old and Caucasian); (7) William Mecum (thirty-one years old and Caucasian); (8) Gale Reynolds (fifty years old and Caucasian); (9) Hector Rodriguez (thirty-three years old and Hispanic); (10) Amanda Scholl

(twenty-seven years old and Caucasian); (11) Roderick Tayag (thirty-four years old and Asian/Pacific-Islander); (12) Russell Taylor (forty-five years old and African-American); (13) Shirley Torres (fifty-eight years old and Caucasian); and (14) Alvin Brooks (twenty-seven years old and African-American). *Id.* ¶ 21.

### Given "Exceeds Standards" Rather than "Role Model" Performance Rating

In November 2007, Plaintiff received a PASS ("Performance Accountability Standards System") rating of "Exceeds Standards," one step below the highest rating of "Role Model." *Id.* ¶ 23. Plaintiff believes that he was set up to fail because he was assigned poor performing employees for his team. Of the sixteen employees assigned to him, eight had been charged with being absent without leave during the 2007 PASS rating period. *Id.* ¶ 24. Plaintiff argues that two other employees, Lonnie Acosta (forty-one years old and national origin not Polish) and Michael Nelson (sixty-one years old and national origin not Polish), both of whom held the same position as Plaintiff, received "Role Model" ratings in 2007. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 18. However, neither of the two other higher-rated employees was selected for any of the positions for which Plaintiff applied, and there is no evidence in the record that either received any specific raise, reward, or any benefit whatsoever from having received a higher 2007 PASS rating than Plaintiff. *See generally* Def.'s Ex. G, Resps. Interrogatories; Def.'s LR 56.1(a)(3) Stmt.; Pl.'s LR 56.1(b)(3)(C) Stmt.

### Plaintiff's First EEOC Complaint

On December 21, 2007, Plaintiff filed his first EEOC complaint. He alleged that TSA had discriminated against him based on his national origin and age by failing to promote him to the 0367, 0425, 0445, and 0471 Positions in 2007 and giving him an "Exceeds Standards" rather than "Role Model" 2007 PASS rating. Def.'s LR 56.1(a)(3) Stmt. ¶ 2.

***Promotion to Supervisory Transportation Security Inspector***

In March 2008, TSA promoted Plaintiff to Supervisory Transportation Security Inspector, an H-Band position, at O'Hare Airport. *Id.* ¶ 31. Andrew Huber, Assistant Federal Security Director for Regulatory Inspection at O'Hare Airport, and Eustacio Berganos, Supervisory Inspector for Cargo at O'Hare Airport, and one or two other people interviewed Plaintiff for the position. *Id.* Berganos recommended Plaintiff for the position. *Id.*

***Denial of In-Position Increase ("IPI") in 2009***

On November 6, 2009, Berganos informed Plaintiff: "I was unable to justify an IPI for you this year due to the issue we had at the beginning of the fiscal year regarding [Plaintiff's] work plan. . . . When I return, we're going to sit down and create sound, attainable goals that will put you in a position to receive IPIs in the future." *Id.* ¶ 33; Pl.'s Ex. 4, Email of 11/6/09 from E. Berganos to M. Fudali, at P10 001224. On November 10, 2009, Plaintiff presented arguments as to why he should receive an IPI for fiscal year 2009. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 21. In response, Berganos stated: "If you will recall, we discussed, after the long conversation we had on 'time management', that the time you spent on the EEOC case still did not justify how far behind you were in your work plan." *Id.*

When Plaintiff met with Berganos in December 2009, Plaintiff still believed that he could receive an IPI for fiscal year 2009. *Id.* ¶ 33. In March or April 2010, Berganos told Plaintiff that he was still looking into the 2009 IPI issue. *Id.* ¶ 34. In June 2010, Plaintiff asked Berganos about the IPI and Berganos said "forget about that stuff, there's another IPI coming up in September." *Id.* ¶ 35. Although TSA originally represented that Berganos denied all of his employees an IPI in 2009, *see id.* ¶ 36, TSA admits that, in fact, Berganos awarded IPIs for fiscal year 2009 to Juan Munoz, who was thirty-one years old and non-Polish, and Josh Bubinas, who

was thirty years old and non-Polish, as well as two other employees, Elizabeth Kornegay and Elise Sheldon, both in the protected age group and non-Polish. *Id.* ¶¶ 30, 36.

In 2009, Berganos recommended that Plaintiff receive a cash award of $2,000.00. Def.'s LR 56.1(a)(3) Stmt. ¶ 34. Huber approved the recommendation, and Plaintiff received the cash award. *Id.*

### *Denial of Promotion to Transportation Security Inspector ("198784 Position")*

In December 2009, Plaintiff applied and interviewed for one of two open positions for Transportation Security Inspector, an I-Band position, with job listing ORD-09-198784 ("198784 Position"). When Plaintiff told his supervisor, Berganos, that he was thinking of applying for the 198784 Position, Berganos told Plaintiff, "We're looking for Aaron Gonzales and Edgar Rivas types." *Id.* ¶ 46. Plaintiff took this to mean that TSA wanted to hire younger, non-Polish people because Gonzales and Rivas were both in their early 30s and Hispanic. *Id.* ¶ 46.

John Beckius, Joyce Dorsey, and Barbara Hornbach interviewed candidates, including Plaintiff, for the 198784 Position. *Id.* ¶ 45. Candidates for the 198784 Position (and all other Transportation Security Inspector positions discussed below) were required to demonstrate, in addition to their past experience and achievements, qualifications in the following categories: (1) Transportation Security Proficiency; (2) Oral Communication; (3) Written Communication; (4) Attention to Detail; (5) Decisiveness; (6) Team Building; and (7) Flexibility. *Id.* ¶ 47.

Andrew Huber, who had the authority to make the hiring decision, did not select Plaintiff for either position. *Id.* ¶ 48. When Huber made the selection, he knew that Plaintiff had filed an EEOC Complaint. Pl.'s Ex. 7, Huber Dep. at 74. During his deposition in the instant litigation, Huber stated that "a tattletale environment . . . [is] not what I fostered in my group." *Id.* at 161. Huber selected Josh Bubinas (thirty-one years old, national origin unspecified) for one of the

positions. *Id.* Bubinas received a score of 18 out of a possible 20 points in his interview, while Fudali received a score of 10 points in his interview. *Id.* ¶ 49. No other interviewee, other than Bubinas, received a score higher than 12. *Id.* The other position was not filled due to the poor interview scores of the remaining candidates. *Id.*

### Plaintiff's Second EEOC Complaint

On September 14, 2010, Plaintiff filed his second EEOC complaint. *Id.* ¶ 2. He alleged that TSA had discriminated against him based on his national origin and age, as well as retaliated against him for filing his previous EEOC complaint, when they failed to give him the IPI in 2009 and failed to promote him to the 198784 Position. *Id.*

### Denial of Promotion to Transportation Security Inspector ("283327 Position" & "329765 Position")

In October 2010, TSA reposted the 198784 Position that had remained unfilled, with job listing ORD-10-283327 ("283327 Position"), and Plaintiff applied and interviewed for the position. *Id.* ¶ 50. Tom Pfister, a transportation security inspector from Milwaukee's airport, Tom Simpson, a transportation security inspector, and Colette Johnson, a human resources specialist from the Indianapolis airport, interviewed the candidates, including Plaintiff, for the 283327 Position. *Id.* ¶ 51. Kathleen Petrowsky, federal security director at O'Hare Airport, and Andrew Huber did not select any candidate for the position due to the universally poor interview scores of the candidates. *Id.*

In March 2011, TSA again reposted the unfilled Transportation Security Inspector position, combined with another Transportation Security Inspector position that became available due to the retirement of an employee, with job listing ORD-11-329765 ("329765 Position"). *Id.* ¶ 52. Joyce Dorsey, an administrative officer from the Indianapolis airport, Matt Pecar, a supervisory transportation security inspector from the Indianapolis airport, and Tim

Lewis, a supervisory transportation security inspector from LAX, interviewed candidates, including Plaintiff, for the 329765 Position. *Id.* Petrowsky and Huber selected David Kuchar (thirty-two years old, national origin unknown) and Brad Eastridge (thirty-one years old, national origin unknown). *Id.* Kuchar scored 17 out of 25 possible points in his interview, Eastridge scored 16 out of 25, and Plaintiff scored 15 out of 25. *Id.* ¶ 53.

Petrowsky and Huber chose Kuchar and Eastridge because they had demonstrated strong written communication proficiency whereas the other candidates had not. *Id.* For example, Kuchar and Eastridge had been associated with forty-nine administrative cases each and had written eleven and twelve enforcement investigative reports, respectively, for those cases. *Id.* Plaintiff had been associated with thirty-three administrative cases and had completed zero enforcement investigative reports. *Id.*

### Comments About Plaintiff's National Origin

In addition to the comments described above regarding Plaintiff's national origin, Plaintiff bases his national origin hostile work environment claim on the following events. In August 2002, Plaintiff told manager Michael Ray and coworker Kirk Hyde that certain passengers were not responding to their questions because the passengers did not speak English. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 1. Ray and Hyde responded by saying that Plaintiff was "one of them, too . . . a dumb Polack." *Id.* In the fall of 2002, Jerry Blair, a coworker, commented to employees under Plaintiff's supervision that "only someone who is Polish would interpret the SOP [standard operating procedures] literally." *Id.* ¶ 2.

Beginning in 2003 and ending in 2007, Screening Manager Dale Harris referred to Plaintiff as a "Nazi" on many occasions because Plaintiff spoke limited German when translating for German-speaking customers. *Id.* ¶ 3. Harris's conduct ceased in October 2007. *Id.*

Screening Managers Michael Ray and Steve Brown also referred to Plaintiff as a "Nazi," and Ray, in particular, would click his heels, give Plaintiff the Nazi salute, and say "Heil Hitler" any time he saw Plaintiff. *Id.* This made Plaintiff very upset because his grandmother had been killed by Nazis, his father endured four years of hiding during World War II, and two of his aunts and uncles were taken as slave labor in Germany. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 3. Ray and Brown's conduct ceased in 2007. Pl.'s Ex. 1, Pl.'s Dep. at 69.

At some time prior to November 2007, Supervisor Amiel Jackson asked Plaintiff, "What is it with you Polish guys that you always have issues with things?" Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 5; Pl.'s Ex. 1, Pl.'s Dep. at 108.

In the fall of 2007, a manager named Skip LaSaker stated to Plaintiff that "Polish men look like Neanderthals." Def.'s LR 56.1(a)(3) Stmt. ¶ 28. He went on to say that the men looked like "scum bags." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 4.

In addition to these comments, from April 2008 until January 2010, Plaintiff's supervisor Berganos made bi-weekly remarks regarding Plaintiff's lunches, stating that Plaintiff was eating smelly food or Polish food, even when he wasn't eating Polish food. *Id.* ¶ 6. In April 2008, Berganos began commenting on Plaintiff's membership in the Polish National Alliance and stated that Plaintiff was a "big wig" in the organization. *Id.* After June 2008, when Plaintiff would wear a suit to work, Berganos would comment that he looked like a "Polish prince" or "Polish mafia" member. *Id.*

### Comments about Plaintiff's Age

Plaintiff's age-related hostile work environment claim is based on comments made by Berganos when he was Plaintiff's supervisor beginning in October 2008. *See* Pl.'s Ex. 1, Pl.'s Dep. at 46-47. As mentioned above, when Plaintiff was thinking about applying for the

Transportation Security Inspector position in 2009, Berganos told Plaintiff, "We're looking for Aaron Gonzales and Edgar Rivas types," which Plaintiff took to mean younger people because Gonzales and Rivas were both in their early 30s. Def.'s LR 56.1(a)(3) Stmt. ¶ 46.

About eight to ten times per year since October 2008, Berganos commented that Plaintiff had been in the airline industry forever. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 6. Berganos also made comments regarding Plaintiff's hair being gray or Caucasian and Plaintiff's being one of the original co-founders of Pan American at the turn of the century. *Id.* Once when Plaintiff was running late, Berganos commented that Plaintiff should go to sleep earlier and get up earlier at his age. *Id.*

## Discussion

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it*." Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013); *see Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).

Title VII prohibits employers from discriminating against an employee "because of . . . national origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA prohibits an employer from discriminating against individuals in the protected age group of persons 40 years of age and older. 29 U.S.C. § 623(a); *id.* § 631(a). Employers are prohibited from retaliating against an employee for complaining about discrimination that violates Title VII or the ADEA. 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d). Plaintiffs may bring a claim of a hostile work environment based on national origin under Title VII, see *Zayas v. Rockford Mem. Hosp.*, 740 F.3d 1154,

1159 (7th Cir. 2014), and the Seventh Circuit has "assumed without deciding that plaintiffs may bring a claim of a hostile work environment under the ADEA," see *Fugate v. Dolgencorp, LLC*, ___ F. App'x ____, No. 13-1681, 2014 WL 321902, at *5 n.1 (Jan. 30, 2014). The Court addresses each of Plaintiff's claims in turn.

## I.  Age and National Origin Discrimination

"[A] plaintiff may prove discrimination either directly or indirectly." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). "To avoid summary judgment under the direct approach, the plaintiff must produce sufficient evidence, either direct or circumstantial, to create a triable question of intentional discrimination in the employer's decision." *Silverman v. Bd. of Educ. of the City of Chi.*, 637 F.3d 729, 733 (7th Cir. 2011). Circumstantial evidence under the direct approach must lead "directly to the conclusion that an employer was illegally motivated, without reliance on speculation." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 676 (7th Cir. 2012). Alternatively, a plaintiff "may use the well-worn 'indirect,' burden-shifting method of proof recognized in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), under which the plaintiff first establishes a *prima facie* case of discrimination, the employer responds by articulating a legitimate, nondiscriminatory reason for its action, and the plaintiff then has the opportunity to show that the employer's explanation is pretextual." *Hester v. Ind. State Dep't of Health*, 726 F.3d 942, 947 (7th Cir. 2013).[1]

---

[1] "[T]he four elements of the *prima facie* case in a failure-to-promote context are (1) that the plaintiff was a member of a protected class; (2) that he was qualified for the position; (3) that he was rejected for the position; and (4) that the position was given to a person outside the protected class who was similarly or less qualified than he." *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010). To establish a *prima facie* case in a pay-raise claim, a plaintiff must show that: "(1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) [defendant] took an adverse employment action against him; and (4) his employer treated similarly situated individuals outside of the protected class more favorably." *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004).

The direct method and indirect method of proof intersect in a number of ways. For example, where a plaintiff can show the existence of similarly situated comparators who did not experience a similar adverse employment action, such evidence can both serve as circumstantial evidence of discrimination under the direct approach and satisfy one of the *prima facie* elements under the indirect approach. *Chaib v. Indiana*, __ F.3d ___ No. 13-1680, 2014 WL 685274, at *4 (7th Cir. Feb. 24, 2014). Accordingly, a plaintiff's failure to provide evidence of relevant comparators curtails a plaintiff's ability to rely upon the direct approach (particularly where the record is devoid of any other discriminatory evidence) and dooms his efforts to use the indirect approach. Often, evidence related to pretext also arises under both methods. For example, circumstantial evidence from which a reasonable jury can find that an employer's purportedly legitimate reason for the adverse employment action was pretext could constitute circumstantial evidence of discriminatory animus. *Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010). At the same time, under the indirect approach, once a plaintiff establishes a *prima facie* case and the employer offers a purportedly nondiscriminatory reason for the adverse employment action, a plaintiff must then offer facts to show that the stated reason was pretext. *Andrews v. CBOCS West, Inc.*, --- F.3d ----, No. 12-3399, 2014 WL 575893, at *3 (7th Cir. Feb. 14, 2014).

Recently, Chief Judge Diane P. Wood of the U.S. Court of Appeals for the Seventh Circuit in a concurring opinion, which (rather unusually) was joined by the other two judges of the three-judge panel, discussed the knotted relationship between the direct and indirect methods of proof in discrimination cases, noting "it seems to me that the time has come to collapse all these tests into one." *Coleman v. Rosario*, 667 F. 3d 835, 863 (7th Cir. 2012) (Wood, C.J., concurring). The Seventh Circuit has not gone so far as to make this the rule yet, but the facts and issues in this case lend themselves to a discussion focused primarily upon Plaintiff's

attempts to establish the existence of relevant comparators and pretext. The other elements of the direct and indirect methods will be addressed only when necessary.

Turning to the present motion, under either the direct or indirect approach, Fudali has failed to present evidence to create a triable issue as to whether TSA intentionally discriminated against him based on age and national origin when it failed to promote him to the 0367, 0425, 0445, 0471, 283327, or 329765 Positions and failed to rate him as a "Role Model" in his 2007 PASS evaluation. Plaintiff, however, has created a genuine issue as to a material fact as to whether TSA discriminated against him based on age and national origin when it failed to give him an IPI for fiscal year 2009 and denied his promotion to the 198784 Position.

### A. Denial of Promotion to the 0367, 0425, 0445, 0471 Positions

With respect to the 0367, 0425, 0445, and 0471 Positions, Plaintiff's failing interview scores scotch his discrimination claims. Plaintiff scored 13 out of 40 points when interviewing for the 0367 Position and 29 out of 50 points when interviewing for the 0425 Position. Because these were failing scores, he was not selected for either position. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 8, 12, 15. It is likewise undisputed that Plaintiff was not selected for the 0445 and 0471 Positions because he had received a failing interview score with regard to the 0367 Position. *Id.* ¶¶ 18-19. No candidates with failing interview scores were selected for these positions. *Id.* ¶¶ 15, 19. Thus, unless Plaintiff can create a triable issue of fact regarding whether he was given failing interview scores due to his age or national origin or that his failing interview scores were a pretext for age or national origin discrimination, such claims must fail.

### 1. Age

Under both the direct and indirect method, Plaintiff argues that his failing score with regard to the 0367 Position indicates age-based animus by one of the interviewers, John

Thurwanger, as well as pretext. Thurwanger asked each candidate questions about TSA job-related situations, and each candidate received points if the answer described the details as to who and what was involved, how and why the situation occurred, and whether any quality improvements resulted from the situation. Pl.'s Ex. 14, Thurwanger Aff. at 001448. Thurwanger explained that "Mr. Fudali was able to describe the situation but not much more. Those candidates receiving higher scores than Mr. Fudali were able to provide more specifics." *Id.* Plaintiff opines that one of Thurwanger's stated reasons for Plaintiff's failing score, *i.e.*, that "almost all of Mr. Fudali's answers related to situations that occurred many years ago," demonstrates Thurwanger's bias against Plaintiff's age. *Id.*; *see* Pl.'s LR 56.1(b)(3)(C) ¶ 11.

The Court disagrees. Plaintiff's attempt to equate age with length of service is a nonstarter. *See Grabb v. Bendix Corp.*, 666 F. Supp. 1223, 1247 (N.D. Ind. 1986) ("[L]ength of service has no bearing on the issues in this case since the focus is on age."); *see Testerman v. EDS Technical Prods. Corp.*, No. IP 94-365-C-H/F, 1995 WL 904816, at *13 (S.D. Ind. Dec. 27, 1995) ("An employee could begin working for an employer at age 20 . . . , have almost 20 years of service with the company, and still not even be in the age group protected by the ADEA."). This is especially evident given that Plaintiff had only been employed by TSA for a relatively short time at the time of the interview, *i.e.*, approximately five-and-a-half years, and thus his job-related answers would have involved events that occurred, at most, five-and-a-half years prior to the interview. *See* Pl.'s Dep. at 7. Plaintiff fails to offer any statistical comparison between his length of service and age and those of the selected candidates in order to create an inference that a candidate's length of service correlated with the candidate's age. Without more, Thurwanger's statement that Plaintiff's answers during the 0367 Position interview related to situations that occurred many years ago does not create a reasonable inference that he gave Plaintiff a failing

interview score based on age bias. Further, Plaintiff offers no evidence to contradict TSA's assertion that he failed the interview also because he was unable to describe specific details about the situations, including who and what was involved, how and why the situation occurred, and whether any quality improvements resulted from the situation.

Because Plaintiff is unable to create a triable issue as to whether his failing interview score for the 0367 Position was due to a prohibited age-based animus, Plaintiff's claim necessarily fails. He points to no other candidate for the position who was not in the protected age class, received a failing interview score, and yet was selected for the 0367 Position.[2] For all of these reasons, the Court holds that no rational jury could find that TSA's denial of Plaintiff's promotion to the 0367 Position was due to age bias.

As for the 0425 Position, Plaintiff's age discrimination claim also fails. Plaintiff does not attack his failing 0425 interview score as being the product of age bias. Nor could he. It is undisputed that both of the candidates selected for the 0425 Position were in the protected age group: one was sixty years old, and the other was forty-seven years old.[3] Def.'s LR 56.1(a)(3) Stmt. ¶ 13. Thus, Plaintiff cannot point to a candidate who was promoted to the 0425 Position, was not in the protected age class, and received a failing interview score for that position.

With regard to the 0445 and 0471 Positions, Plaintiff's age discrimination claim also flounders. It is undisputed that TSA's proffered reason for not considering Plaintiff for the 0445 and 0471 Positions was because he had failed the interview for the 0367 Position. As discussed

---

[2] Moreover, half of the selected candidates for the 0367 Position were forty years of age or older and in the protected age group. Def.'s LR 56.1(a)(3) Stmt. ¶ 9. One of the four selected candidates was fifty-eight years old, *i.e.*, older than Plaintiff, and scored 40 out of 40. *Id.* Another of the four selected candidates was forty-four years old and scored 38 out of 40. *Id.*

[3] Plaintiff points out that the sixty-year-old's name originally had been marked as "NS" or "not selected" on a sheet related to the interview. According to Plaintiff, this supports the conclusion that the candidate was originally thought to have been unqualified for the position, but was selected anyway. Unfortunately for Plaintiff, he has not provided any facts to support this supposition.

above, Plaintiff has failed to create a triable issue as to whether that failing interview score was age-biased. Plaintiff's reliance on this same evidence to show that he was denied promotion to the 0445 and 0471 positions is equally unavailing. Moreover, Plaintiff does not point to any other candidate for these positions that was not in the protected age group, received a failing interview score, and yet was selected for these positions.[4]

For all of these reasons, the Court grants Defendant's motion for summary judgment as to Plaintiff's age discrimination claims regarding the 0367, 0425, 0445, and 0471 Positions.

## 2. National Origin

Under either the direct or indirect method, Plaintiff has failed to raise a triable fact as to his claim that TSA had discriminated against him based on national origin when it failed to promote him to the 0367, 0425, 0445, and 0471 Positions.

Plaintiff argues that a reasonable jury could infer that the denial of his application for the 0367 Position was based on national origin. Plaintiff asserts, and Defendant disputes, that right before Plaintiff's interview for this position, Screening Supervisor Michael Ray told Plaintiff an offensive joke that NAACP meant "niggers are actually colored Polacks" and then walked Plaintiff to the interview and then introduced Plaintiff to both interviewers. *Id.* ¶ 10. Even assuming Plaintiff's version of events to be true, as the Court must for the purpose of this motion, this does not raise a triable issue of fact, because the record is devoid of any facts showing that Ray had any input in either the interview or the selection process for the 0367 Position. Instead, it is undisputed that John Thurwanger and Scott McKellips interviewed, and John Fletcher selected, the candidates for the 0367 position. Thus, to the extent that Ray held any discriminatory animus because of Plaintiff's national origin, it is unreasonable to infer that

---

[4] In fact, four of the fourteen candidates selected for the 0445 and 0471 Positions were members of the protected age class, one selected candidate was a year shy of being in the protected age class, and another selected candidate was two years shy of being in the protected age class. *Id.* ¶ 21.

he tainted or affected the interview, interview scoring, or selection process. Accordingly, Plaintiff has not created a genuine factual issue as to whether his failing interview score for the 0367 Position was due to illegal animus against people of Polish national origin. Nor has Plaintiff pointed to a candidate not in the protected national origin class, who had received a failing interview score but nonetheless was hired. As a result, Plaintiff's claim based on the 0367 Position is also deficient.

With regard to the 0425 Position, Plaintiff has not provided any evidence that his failing interview scores were motivated by national origin animus. Further, Plaintiff does not proffer any candidate not in the protected national origin class, who had received a failing interview score but was selected.

As for the 0471 Position, Plaintiff was flown to Dallas-Fort Worth Airport for the interview. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 12. During that interview, Plaintiff was asked about his accent by the interview panel members, and Plaintiff informed them that he was Polish. *Id.* One of the panel members said, "Flying you out after you had failed at ORD is like a Polish joke. Why are you here? Why did they do this?" *Id.* Viewing this fact as true, a reasonable jury could conclude from this statement that the interviewer held a prohibited animus against people of Polish national origin and hence tainted the interview process. It is undisputed, however, that Michael Kimlick, the person who actually hired the candidates for the 0445 and 0471 Positions, did not consider Plaintiff for the sole reason that Plaintiff had previously received a failing score when he had interviewed for the 0367 Position. Def.'s LR 56.1(a)(3) ¶¶ 18-19. It is also undisputed that Kimlick had no knowledge of Plaintiff's national origin when he selected the candidates for the 445 and 471 Positions. *Id.* ¶ 20. Given these undisputed facts, even when all of the disputed facts are viewed in Plaintiff's favor, it cannot be reasonably inferred that

Kimlick's selection of candidates for the 0445 and 0471 Positions was in any way based on improper national origin animus.

For all of these reasons, the Court grants Defendant's motion for summary judgment as to Plaintiff's national origin discrimination claims based on the denial of promotions to the 0367, 0425, 0445, and 0471 Positions.

## B.  Denial of "Role Model" Performance Rating in 2007

Next, Plaintiff argues that TSA's denial of a "Role Model" Performance Rating in 2007 constituted age and national origin discrimination.  "The requirement that a plaintiff show [he] suffered an adverse employment action as a result of h[is] employer's alleged discrimination is an element of any Title VII claim, regardless of whether the claim is reviewed under the traditional direct/indirect framework or the less rigid framework our cases have recently suggested."  *Chaib*, 2014 WL 685274, at *5; *see Andrews*, 2014 WL 575893, at *4 (holding that adverse employment action is an element common to discrimination and retaliation claims under both the direct and indirect methods). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009) (quotation omitted). "[A]lthough the definition of an adverse employment action is generous, an employee must show some quantitative or qualitative change in the terms or conditions of his employment or some sort of real harm." *Id.* at 1116–17 (quotation marks omitted).

Plaintiff has failed to create a genuine issue of material fact as to whether his receipt of an "Exceeding Standards" versus a "Role Model" rating in 2007 constitutes an adverse employment action.  There is no evidence that Plaintiff experienced a quantitative or qualitative change in the terms or conditions of his employment or suffered some sort of real harm on

account of receiving an "Exceeding Standards" rating. For example, there is no evidence that this rating impacted his salary, was a factor in selecting candidates for any of the jobs for which he applied, caused the denial of his IPI in 2009, or affected any term or condition of his employment. While Plaintiff points to two other employees who received a "Role Model" rating in 2007, there is no evidence as to whether and how that rating benefited their employment, if at all. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 18. In fact, neither of the employees who received a "Role Model" rating was selected for any of the positions at issue in this case or received an IPI in 2009. *Compare id.* ¶ 18, *with id.* ¶ 30, *and* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 9, 13, 21, 48, 53. Without any evidence that his 2007 rating affected any term or condition of Plaintiff's employment, no rational jury could find in his favor with regard to his age discrimination, national origin discrimination, or retaliation claims based on the 2007 rating. Thus, the Court grants Defendant's motion for summary judgment as to these claims.

### C. Denial of 2009 In-Position Increase

Before proceeding to the merits of this claim, the Court must address Defendant's threshold argument that Plaintiff has failed to exhaust his administrative remedies as to his discrimination (as well as his retaliation and hostile work environment) claims based on Defendant's failure to provide Plaintiff an IPI in 2009. In response, Plaintiff argues that equitable estoppel saves these claims.

"An individual pressing an employment discrimination claim must initiate contact with an EEOC counselor within 45 days of the alleged discriminatory action." *Gray v. Potter*, 115 F. App'x 891, 893 (7th Cir. 2004); *see* 29 C.F.R. § 1614.105(a)(1). "[T]he common law doctrines of equitable tolling and equitable estoppel can justify an exception to the 45-day rule in certain circumstances." *Gray,* 115 F. App'x at 893. "Equitable estoppel applies only if the employer

took 'active steps' to prevent the plaintiff from filing a discrimination charge on time." *Jackson v. Potter*, 240 F. App'x 136, 139 (7th Cir. 2007). The plaintiff "must also establish that she actually and reasonably relied on the employer's conduct or misrepresentation." *Id.*

The following facts are undisputed. On November 6, 2009, Berganos, Plaintiff's supervisor, informed Plaintiff: "I was unable to justify an IPI for you this year due to the issue we had at the beginning of the fiscal year regarding [Plaintiff's] work plan." Def.'s LR 56.1(a)(3) Stmt. ¶ 33; Pl.'s Ex. 4, Email of 11/6/09 from E. Berganos to M. Fudali, at P10 001224. Berganos, however, told Plaintiff in April 2010 that he was still looking into whether Plaintiff was eligible for an IPI for fiscal year 2009. Pl.'s LR 56.1(b)(3)(C) ¶ 34. In June 2010, when Plaintiff asked Berganos about the 2009 IPI, Berganos said, "Forget about that stuff, there's another IPI coming up in September." *Id.* ¶ 35. On June 25, 2010, Plaintiff initiated contact with the EEOC regarding the denial of the IPI. Def.'s Ex. B, Compl., Ex. B, 7/23/10 Email from G. Corbett to M. Fudali ("I have your initial contact date as 06/25/10.").

Given these facts, a reasonable jury could conclude that Defendant took active steps to mislead Plaintiff to prevent him from filing a timely EEOC complaint and that Plaintiff actually and reasonably relied on Berganos' representations that it was still possible that Plaintiff would receive an IPI for fiscal year 2009 even as late as September 2010. Plaintiff initiated contact with the EEOC in June 2010, and thus a reasonable jury could conclude that his claim based on the IPI for fiscal year 2009 is not time-barred.

Turning to the merits of Plaintiff's claims, the Court concludes that Plaintiff's age and national origin discrimination claims survive summary judgment under either the direct or indirect method of proof.[5] The evidence in the record supports a reasonable inference that

---

[5] It is undisputed that Berganos awarded IPIs for fiscal year 2009 to Juan Munoz, a thirty-one-year-old, non-Polish male, and Josh Bubinas, a thirty-year-old, non-Polish male, as well as two other employees.

Berganos's reasons for denying Plaintiff an IPI for fiscal year 2009 shifted over time, and a rational jury could infer from facts in the record that the denial was a pretext. *See Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) (noting "if the employer changes its story, that constitutes evidence of pretext, and entitles [the plaintiff] to a trial on the issue of the reason for his termination").

Berganos originally stated that the reason he would not recommend Plaintiff for an IPI was that Plaintiff did not submit enough inspections for the first quarter. *See* Def.'s Ex. L, Berganos/Fudali Email Exchange, 12/12/09 Email.[6] Plaintiff has presented evidence that he in fact submitted more inspections in the first quarter than Munos or Bubinas. Pl.'s Ex. 2, Fudali 7/13 Decl. ¶ 4. When Plaintiff confronted Berganos with this, Berganos changed the reason for denying Plaintiff an IPI, telling him that the number of inspections is not the only factor that affected a decision to award an IPI and that Berganos also assesses an employee's ability to mentor, self-initiative, quality of work, and ability to work independently. *See id.*, 11/09/09 Email. Given that Munoz and Bubina were not in the protected age class and were not Polish, and considered in conjunction with the other comments made by Berganos over time, a reasonable jury could reasonably infer from Berganos' backpedaling that the decision not to award an IPI to Plaintiff was due to impermissible age and national origin discrimination.

---

Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 30. Accordingly, in his efforts to prove these claims via the indirect method, Fugali has demonstrated that he was a member of the protected class, he did not receive the IPI, and IPIs were awarded to others who are not in the protected class. As discussed below, whether Fugali in fact was qualified to receive the IPI is intertwined with whether TSA's stated reasons for not awarding the IPI to him was pretext. In such instances, "the second prong and the pretext question seemingly merge because the issue is the same—whether the employer is lying." *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 822 (7th Cir. 2006). Accordingly, "we focus on the question of pretext, while keeping in mind that if the plaintiffs did not present sufficient evidence of pretext, they also did not show that they were meeting their employer's expectations." *Id.* Of course, the reverse is also true.

[6] Berganos also told Plaintiff that Berganos had rejected many of Plaintiff's inspections in 2009. *See id.*, 11/10/09 Email. Plaintiff has documentation that for a prolonged period of time in 2009, he had fewer rejected inspections than those who received IPIs for fiscal year 2009. Pl.'s Ex. 2, Fudali 7/13 Decl. ¶ 6.

Accordingly, the Court denies Defendant's motion for summary judgment as to Plaintiff's discrimination claims based on the denial of an IPI for fiscal year 2009.

### D. Denial of Promotion to the 198784 Position

Defendant also argues as a threshold matter that Plaintiff's claims based on the 198784 Positions are barred by the statute of limitations. Again, the Court disagrees. In March or April 2010, Huber decided to select Josh Bubinas for one of the 198784 Positions and leave the other vacant. Pl.'s Ex. 7, Huber Dep. at 74. In May 2010, Huber met with Plaintiff to inform him that he was not selected for the 198784 Position. *Id.* at 80. Viewing this fact in Plaintiff's favor, the Court assumes that this meeting occurred on May 31, 2010. Thus, at the very latest, Plaintiff was required to file his EEOC Complaint based on the denial of a promotion to either of the 198784 Position on July 15, 2010, within forty-five days of the meeting. Because Plaintiff's initial contact with the EEOC occurred on June 25, 2010, these claims are not time-barred. *See* Def.'s Ex. B, Compl., Ex. B, 7/23/10 Email from G. Corbett to M. Fudali ("I have your initial contact date as 06/25/10.").

Turning to the merits, Plaintiff points to the following facts that, in his view, require the denial of summary judgment as to his age and national origin discrimination claim based on the 198784 Position. When Plaintiff told Berganos, his supervisor, that he was thinking of applying for the 198784 Position, Berganos told Plaintiff, "We're looking for Aaron Gonzales and Edgar Rivas types." Def.'s LR 56.1(a)(3) Stmt. ¶¶ 45-46. Gonzales and Rivas were both in their early 30s and not Polish. *Id.* This statement creates a reasonable inference that Berganos, as Plaintiff's supervisor, was aware of the type of candidate TSA wanted for the 198784 Position and that the desired candidate was someone who was not in the protected age group or of Polish national origin. This along with the other comments made by Berganos is sufficient for

Plaintiff's age and national origin discrimination claims to withstand summary judgment.  Thus, the Court denies Defendant's motion for summary judgment as to Plaintiff's discrimination claims with respect to the 198784 Position.

### E.  Denial of Promotions to the 283327 and 329765 Positions

Defendant argues that Plaintiff failed to exhaust his administrative remedies with regard to his claims based on the 283327 and 329765 positions.  When Plaintiff filed his EEOC Complaint on September 14, 2010, his complaint did not include allegations regarding the 283327 and 329765 Positions because the events surrounding the denials of these promotions had not yet occurred.  Plaintiff applied for the 283327 Position on October 20, 2010, and the 329765 Position on March 8, 2011.  Def.'s LR 56.1(a)(3) Stmt. ¶ 50.

"To include a discrimination claim in a federal district court complaint that was not brought in the charges filed with the EEOC a plaintiff must pass the two prong test . . . :  (1) the claim is like or reasonably related to the charges, and (2) the claim in the complaint reasonably could develop from the investigation into the original charges."  *Harper v. Godfrey Co.*, 45 F.3d 143, 148 (7th Cir. 1995).  "The claims are not alike or reasonably related unless there is a factual relationship between them. This means that the charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals*."  *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994).

Plaintiff argues that the denials of his promotion to the 283327 and 329765 Positions are like or reasonably related to his charge based on the 198784 Position because the 283327 Position was merely a re-posting of the unfilled 198784 Position and one of the two 329765 Position was simply a reposting of the unfilled 283327 Position.  The Court disagrees.  The claims based on the three positions are not alike or reasonably related because they did not

implicate the same individuals. The three-person panel of interviewers for each of the 198784, 283327, and 329765 Positions did not include any of the same interviewers. The lack of common interviewers is a pivotal difference because the proffered reason for the denial of the promotions was Plaintiff's low interview scores. In addition, the selection process for the 198784 Position occurred prior to May 2010 and the interviews for the 283327 and 329765 Positions did not occur until October 2010 and March 2011, respectively. Because of the differences in the interview panels and the temporal gap between the interview for the 198784 Position and the interviews for the 283327 and 329765 Positions, the claims in the instant complaint based on the 283327 and 329765 Positions could not have reasonably developed from the investigation into the original charges based on the 198784 Position. *See Conner v. Ill. Dep't of Natural Res.*, 413 F.3d 675, 680 (7th Cir. 2005) (stating that it would be impossible for plaintiff to describe, let alone EEOC to investigate, allegations of a racially discriminatory non-promotion in December 2002 where the EEOC charge alleging a different racially discriminatory non-promotion was filed in November 2002); *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202-03 (7th Cir. 1996) (barring claim where EEOC charges implicated different individuals than allegations in complaint). Accordingly, the Court grants Defendant's summary judgment motion as to any claim based on the 283327 and 329765 Positions.

## II. Retaliation

Plaintiff also asserts that TSA retaliated against him for filing the EEOC Complaints on December 21, 2007, and on September 14, 2010. [7] "A prima facie case of retaliation may be made directly or indirectly." *Kodl v. Bd. of Educ. Sch. Dist. 45*, 490 F.3d 558, 562 (7th Cir. 2007). "Under the direct method, a plaintiff must show (1) she engaged in statutorily protected

---

[7] For the reasons discussed above, the Court has granted summary judgment as to Plaintiff's claims based on the denial of promotions that occurred after the September 14, 2010, charge.

activity; (2) she suffered an adverse employment action taken by the employer; and (3) a causal connection between the two." *Id.* "Under the indirect method, plaintiff must show that she (1) engaged in statutorily protected expression, (2) met the employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected expression." *Id.*

### Denial of IPI for Fiscal Year 2009

The Court holds that Plaintiff has created a triable issue of fact as to his retaliation claim based on the denial of the IPI for fiscal year 2009 under the direct method. Plaintiff has established that he engaged in statutorily protected expression by filing an EEOC Complaint on December 21, 2007. Def.'s LR 56.1(a)(3) Stmt. ¶ 2. He has established that he suffered an adverse employment action when he was denied the IPI for fiscal year 2009. *Id.* ¶ 35. Furthermore, the following facts create a triable issue as to whether he was denied an IPI because he filed the EEOC Complaint.

In an email to Plaintiff dated November 10, 2009, Berganos discussed why he would not recommend Plaintiff for an IPI: "[T]he time you spent on the EEOC case still does not justify how behind you were in your work plan." Pl.'s Ex. 4, Email of 11/10/09. Because Berganos mentions the "EEOC case" as a reason for the denial of the IPI for fiscal year 2009, a jury must sort out whether there is a causal connection between Plaintiff's EEOC Complaint and Berganos's denial of the IPI. Defendant argues that when Berganos said "EEOC case," he was referring to an unrelated slip-and-fall case where Plaintiff was a witness. Whether Berganoss explanation is credible is a determination that a jury must make.

### *Denial of Promotion to the 198784 Position*

Plaintiff's retaliation claim based on the denial of his promotion to the 198784 Position also survives summary judgment. Plaintiff has established a *prima facie* case under the indirect method of proving retaliation. He engaged in statutorily protected activity on December 21, 2007, Def.'s LR 56.1(a)(3) Stmt. ¶ 2; he met the qualification requirements for the 198784 Position, Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 38; he was not selected for the promotion, *id.* ¶ 39; and Josh Bubinas, who had not engaged in statutorily protected activity, was selected for the 198784 Position, *id.*; Def.'s Ex. G, at Ex. G00018.

Defendant does offer a legitimate, nonretaliatory reason for its decision not to promote Plaintiff to the position: his low interview score. Def.'s LR 56.1(a)(3) Stmt. ¶ 49. He scored only 10 out of a possible 20 points. *Id.* But Plaintiff provides the following facts to show that his low interview score was a pretext for retaliation. Plaintiff states that the three individuals on the interviewing panel froze in silence, put their pens down, and had a look of amazement on their faces when he mentioned that Berganos had denied his IPI because Berganos accused him of spending too much time on his EEOC case. Pl.'s Ex. 1, Pl.'s Dep. at 151-52. From the reaction of the interview panel, Plaintiff knew that the interview was over. *Id.* at 152.

A reasonable jury could infer from Plaintiff's description of the interview that the panel reacted negatively to the fact that Plaintiff had filed an EEOC case. In addition, Huber, who was the decision maker, knew Plaintiff had filed an EEOC complaint when he denied Plaintiff's promotion to the 198784 Position. Pl.'s Ex. 7, Huber Dep. at 74. Furthermore, Huber is on record as stating that "a tattletale environment . . . [is] not what I fostered in my group." *Id.* at 161. Huber also was fully aware that Berganos had denied Plaintiff's IPI for fiscal year 2009 and used Plaintiff's "EEOC case" as a reason for the denial. Def.'s Ex. L, Emails, at Ex.

L00002.  A reasonable jury could find that these facts, when combined, create a reasonable inference that, like the interview panel, Huber was not pleased with Plaintiff's EEOC complaint and denied the promotion as a result.  Again, while Defendant argues that Huber did not consider Plaintiff's EEOC complaint when he denied his promotion to the 198784 Position, *id.* at 79, on summary judgment, the Court views all disputed facts and draws all inferences in favor of the nonmovant.  Based on the facts in the summary judgment record, a reasonable jury could find that the denial of the promotion to the 198784 Position was retaliatory.  Thus, the Court denies Defendant's motion for summary judgment as to Plaintiff's retaliation claim with respect to the 198784 Position.

### III. Hostile Work Environment

In an effort to save his hostile work environment claims from summary judgment review, Plaintiff argues that Defendant has failed to move for summary judgment as to these claims.  The Court disagrees.

As an initial matter, it is plain that Defendant has moved for summary judgment, not for partial summary judgment.  Second, Defendant cites authority addressing Plaintiff's hostile work environment claims in its memorandum in support as well as in its reply brief.  *See* Def.'s Mem. Supp. Summ. J. 9-10; Def.'s Reply Mem. Supp. Summ. J. 22-23.  Third, Defendant includes facts relating to Plaintiff's hostile work environment claims in both its opening brief and its Local Rule 56.1 statement of material facts.  Plaintiff not only responds to those fact statements, but also includes additional fact statements bolstering these claims in his Local Rule 56.1 statement of additional facts, and presents his arguments on the merits.  Thus, because both parties have treated Plaintiff's hostile work environment claims as having been brought into play by Defendant's summary judgment motion and discussed them in their papers, the Court declines

Plaintiff's invitation to hold that Defendant failed to raise these claims when moving for summary judgment.

As for the merits of these claims, an employer violates Title VII and the ADEA if it is responsible for a "hostile work environment." *See Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004) (Title VII); *Fugate*, 2014 WL 321902, at *5 n.1 (assuming without deciding that hostile work environment claim is permitted under the ADEA). A hostile environment is one that is "permeated with discriminatory intimidation, ridicule and insult." *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 704 (7th Cir. 2001). To overcome summary judgment, a plaintiff must create a genuine issue of material fact as to all of the following elements: "(1) the work environment must have been both subjectively and objectively offensive; (2) h[is] . . . national origin [or age] must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Chaib*, 2014 WL 685274, at *8 (national origin); *see Fugate,* 2014 WL 321902, at *5 n.1 (age).

### A. Age

With regard to Plaintiff's hostile work environment claim based on age, Plaintiff has failed to create a genuine issue of material fact regarding whether the conduct of which he complains was severe or pervasive. Approximately eight to ten times per year starting in October 2008, Berganos remarked to Plaintiff that Plaintiff had been in the airline industry forever. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 6. Berganos on a single occasion told Plaintiff that he needed to go to bed earlier at his age. *Id.* Berganos also made comments about Plaintiff's grey hair, but Plaintiff does not state how frequently such comments were made. (*Id.*) Furthermore, Berganos told Plaintiff that TSA was looking for "Aaron Gonzales and Edgar Rivas types" for

the Transportation Security Inspector position, which Plaintiff construed to mean TSA wanted to promote a person in his early 30s. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 45-46. This is the sum total of the age-related comments in the record.

Viewing the facts and circumstances in their totality, no reasonable jury could find that Berganos' comments were sufficiently severe or pervasive to have altered the terms or conditions of Plaintiff's employment. *See Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir. 1993) (stating that even offensive conduct that causes an employee "significant discomfort and distress" is not generally sufficient to demonstrate a hostile environment if the conduct is infrequent or of limited duration); *see also Lenoir v. Roll Coater, Inc.*, 841 F. Supp. 1457, 1463 (N.D. Ind. 1992) (quotation omitted) ("[N]either racial comments that are merely part of casual conversation, nor infrequent, sporadic, accidental racial comments or epithets even if they engender offensive feelings in an employee, rise to the level of a Title VII violation . . . ."). The Court thus grants TSA's motion for summary judgment as to Plaintiff's hostile work environment claim based on age.

### B. National Origin

Plaintiff's hostile work environment claim based on his Polish national origin fares only slightly better. Specifically, Plaintiff alleges that he was subjected to intimidation, ridicule, and insult because he was from Poland, spoke with an accent, and his linguistic characteristics sounded German. "The EEOC defines national origin discrimination broadly to include the denial of employment opportunities because of an individual's, or his or her ancestor's, place of origin or because an individual has the physical, cultural, or linguistic characteristics of a national origin group." *Salas v. Wisc. Dep't of Corr.*, 493 F.3d 913, 922 (7th Cir. 2007) (emphasis omitted); *see* 29 C.F.R. § 1606.1. Even when a plaintiff has been harassed under the

mistaken belief that his ethic characteristics belong to a different national origin group than his own, such a plaintiff may still establish a hostile work environment cause of action based on national origin. *See, e.g., E.E.O.C. v. WC&M Enters., Inc.,* 496 F.3d 393, 401 (5th Cir. 2007) (plaintiff from India perceived to be Arab); *Boutros v. Avis Rent A Car Sys.*, LLC, No. 10 C 8196, 2013 WL 3834405, at *7 (N.D. Ill. July 24, 2013) (Assyrian plaintiff perceived to be Arab).

As discussed above, one of the elements that Plaintiff must establish to withstand summary judgment with respect to this claim is that a basis for employer liability exists. *Chaib*, 2014 WL 685274, at *8. Whether there is a basis for employer liability depends on the status of the harasser. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

*Id.* "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.*

As to most of the employees, who made statements regarding Plaintiff's national origin, including Jerry Blair, Kirk Hyde, Steve Brown, Michael Ray, and the interviewer for the 0445 Position, Plaintiff does not explain whether such person had the authority to take tangible employment actions against him. Although the comments were indeed offensive, because Plaintiff has not provided any context from which to infer the authority to hire, fire, or discipline

on the part of the employees who made the offensive comments, the Court holds that Plaintiff has failed to create a genuine issue of fact regarding whether any of them were a "supervisor," thereby creating strict liability for TSA.[8] Thus, as to these employees, TSA could only be held liable if it did not take reasonable care to prevent or correct any harassing behavior after it became aware of it on December 21, 2007, when Plaintiff filed his first EEOC complaint based on such behavior. (*See* Def.'s Ex. A, Am. Compl., Ex. A, at 000004.)

As to this issue, Plaintiff has not raised any facts or inferences that coworkers Jerry Blair, Kirk Hyde, Steve Brown, Michael Ray, and the interviewer for the 0445 Position continued to make offensive comments after December 21, 2007. Blair's comment occurred in 2002. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 2. Hyde and Ray's comment occurred in August 2002. The unidentified interviewer's comment occurred on a single occasion in late 2007. Ray's offensive joke occurred in Fall 2007. And Brown and Ray's conduct ended in 2007. *Id.* ¶¶ 1-3; Pl.'s Ex. 1, Pl.'s Dep. at 69. Because Plaintiff has not raised a triable issue as to the "employer liability" prong of the hostile environment analysis, the Court grants summary judgment as to Plaintiff's national origin hostile work environment claim to the extent it is based on these comments.

With regard to other employees who made national-origin-based statements, including Jackson, Harris, LaSaker, and Berganos, it is undisputed that they were Plaintiff's supervisors, and thus it is reasonable to infer that they had some authority to discipline him. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 5; Def.'s LR 56.1(a)(3) Stmt. ¶¶ 27, 36. Because it may be inferred that these supervisors were empowered to take tangible employment actions against Plaintiff, the

---

[8] It is undisputed that each of the three interviewers in a panel was required to reach a consensus with the other two interviewers before determining a candidate's interview score. With regard to the 0445 Position, it is also undisputed that the sole reason that the decision maker, Kimlick, did not consider Plaintiff for the position was Plaintiff's failing score received while interviewing for the 0367 Position. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 18-19. There is no evidence that Kimlick considered any input from the interviewer who had made the offensive comment during the interview for the 0445 Position.

Court must determine whether "the supervisor's harassment culminate[d] in a tangible employment action." *Vance*, 133 S. Ct. at 2439.

As for Jackson, Harris, and LaSaker, although the comments were unquestionably offensive, there is no evidence in the record that any tangible employment action resulted from their conduct. Thus, Defendant may only be liable if it did not take reasonable care to prevent or correct any harassing behavior after it became aware of it on December 21, 2007. But here again, Plaintiff has not raised any facts or inferences that Jackson, Harris, and LaSaker continued to make offensive comments after December 21, 2007.

At some time prior to November 2007, Jackson asked Plaintiff, "What is it with you Polish guys that you always have issues with things?" Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 5; Pl.'s Ex. 1, Pl.'s Dep. at 108. In the fall of 2007, LaSaker made a single comment to Plaintiff, "Look at these damn Polacks. They look like Neanderthals . . . . and scumbags." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 4; Pl.'s Ex. 1, Pl.'s Dep. at 84. And it is undisputed that Harris' reference to Plaintiff as a Nazi ended in October 2007. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 3. Because there is no evidence that their behavior continued after December 21, 2007, a reasonable jury could not infer that Defendant did not take reasonable care to prevent or correct their behavior after Plaintiff complained of the offensive conduct.

The circumstances surrounding Berganos is different. Genuine issues of fact exist as to whether Berganos's conduct continued after December 21, 2007, and whether Defendant took reasonable steps to prevent or correct such behavior. For example, from April 2008 until January 2010, Plaintiff's supervisor Berganos made bi-weekly remarks regarding Plaintiff's lunches, commenting that Plaintiff was eating smelly food or Polish food, even when he wasn't eating Polish food. *Id.* ¶ 6. In April 2008, Berganos began commenting on Plaintiff's

membership in the Polish National Alliance and stated that Plaintiff was a "big wig" in the organization. (*Id.*) After June 2008, when Plaintiff would wear a suit to work, Berganos would comment that he looked like a "Polish prince" or "Polish mafia" member. *Id.* As such, there are facts from which a jury can infer that Berganos continued to make offensive remarks after December 2007. But this alone is not enough to save Plaintiff's claim. Plaintiff's claim still fails because he has not created a triable issue as to whether Berganos's conduct was sufficiently severe or pervasive to support a hostile work environment claim.

In a hostile work environment claim, "[t]he conduct must . . . be so severe or pervasive as to alter the terms or conditions of the employment relationship." *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (quotation omitted). Factors to determine whether conduct is severe or pervasive include: "its frequency, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with the employee's work performance." *Passananti v. Cook Cnty.*, 689 F.3d 655, 667 (7th Cir. 2012). "The infrequency of the offensive comments is relevant to an assessment of their impact. A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995). "[R]elatively isolated instances of nonsevere misconduct will not support a claim of a hostile environment." *Ngeunjuntr v. Metro. Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998). "This assessment must be made from both subjective and objective viewpoints." *Passananti*, 689 F.3d at 667-68.

Viewing the facts in Plaintiff's favor, no reasonable jury could find that Berganos' comments were severe or pervasive from an objective viewpoint. Berganos's bi-weekly comments about Plaintiff's eating Polish food occurred somewhat frequently, but were not

physically threatening or humiliating. Plaintiff has not stated how frequently Berganos referenced his membership in the Polish National Alliance or commented that Plaintiff looked like a "Polish prince" or "Polish mafia" member, but even if these comments occurred frequently, they also do not rise to the level of a physical threat or humiliation. Moreover, and most importantly, there is no evidence in the record that any national-origin-based comments and conduct have unreasonably interfered with Plaintiff's ability to perform his job. Indeed, Plaintiff states that he has demonstrated impeccable job performance, has passed all of his tests on the first attempt, and has a perfect attendance record. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 7-8; Pl.'s Ex. 1, Pl.'s Dep. at 89. For these reasons, the Court grants Defendant's summary judgment motion as to Plaintiff's hostile work environment claims based on his national origin.

## Conclusion

For the reasons stated herein, the Court grants in part and denies in part Defendant's motion for summary judgment [doc. no. 91]. The Court denies Defendant's summary judgment motion as to Plaintiff's discrimination and retaliation claims based on the denial of his In-Position Increase for fiscal year 2009 and the denial of the promotion to the 198784 Position. In all other respects, Defendant's motion is granted. A status hearing is set for Thursday, April 24, 2014 at 9:00 a.m.

SO ORDERED                                    ENTER:    3/20/14

_____
**JOHN Z. LEE**
**United States District Judge**